IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Criminal Action **No. 09-cr-301-JLK**

**UNITED STATES OF AMERICA,**

    Plaintiff,

v.

**1.    DANIEL ANDRES MORONES,**
**2.    JOSE AUGUSTIN PLUMA,**
**3.    JUAN MARTIN RUELAS**,
**4.    MARK ROSALEZ,**
**5.    JUSTIN HERNANDEZ**,

    Defendants.

---

SENTENCING ORDER
(PLUMA, RUELAS, ROSALEZ, and HERNANDEZ)

---

Kane, J.

    After a three-week jury trial resulted in guilty verdicts on all counts, Defendants

Jose Pluma, Juan Ruelas, Mark Rosalez, and Justin Hernandez appeared before me on

August 25, 2011, for sentencing.[1]  In preparation for this most weighty of my moral and

constitutional duties as a judge, I spent many hours considering Defendants' written

submissions and motions, Presentence Reports, applicable case law and other legal

authorities, and academic writings.  At the August 25 hearing, I also heard oral statements

from the government and from each of the Defendants – through counsel, as none availed

---

[1]    The government's case against Defendant Daniel Morones was severed from the
trial of the instant four Defendants, and is set to commence on September 6, 2011.

himself of his rights of allocution.  I pronounced my sentence for each Defendant individually, explaining my reasoning in statements issued orally from the bench.  I now formalize these sentencing statements and issue them, serially and in writing, below:

I.

JUSTIN HERNANDEZ[2]

*Overview.*

Although the United States Sentencing Guidelines are advisory, I am compelled to consider them notwithstanding my unshakeable conviction that no articulated basis for them exists.  Their nearly ubiquitous use does, however, form a baseline for sentencing and I find the Guidelines useful in that regard.  Because the Supreme Court has ruled that I must first determine whether the Guideline calculations are correctly computed and then consider the recommendation, I must ascertain what the basis is for the advice in order to determine how much weight to give it.

As  reported to me, sentencing factors  were based on summary reports of 40,000 federal convictions for all sorts of crimes, together with a sub-sample of 10,000 presentence reports.  Later, responding to public comment expressing concern that a person convicted of second degree murder might serve as little as 8 years imprisonment and that as of 2002 courts were departing upward in 34.3% of such cases, the Sentencing

---

[2]       While Defendant Justin Hernandez was sentenced last, I position his sentencing statement first given his leadership role in the conspiracy and my extensive comments therein regarding the crime and gang life in prison.

Commission increased the base offense level in its calculations so as to arrive at 20 years. No empirical data was released to support this increase.

According to the Office of General Counsel of the Sentencing Commission, there is no evidence that the Commission distinguished between types or classes of second degree murder. Nor is there any evidence of an attempt to place recommended sentences in contextual circumstances. The calculation is thus relegated to pure speculation.

Second, by following a lock-step approach to Guideline Sentencing, the Probation Department of this court — with more than one officer engaged in the process— makes the identical recommendation for all of the four defendants in this case. This homogenized approach to sentencing is said to avoid disparities in sentences, but it is the disparity in evaluation, not disparity in results, that is contrary to fair adjudications. While it may be said that all cats are gray, it cannot be intelligently asserted that all of them are the same shade of gray. All defendants are not the same and each is entitled to separate consideration. An identical result is in fact indicative of defendants not receiving individual consideration. I am tempted to say in this case especially that I will not indulge in what amounts to a gang mentality.

In accordance with Federal Rule of Criminal Procedure 32 (I) (3)(B), in each of these four cases I will first rule on objections to the presentence report and any other controverted matter or determine that a ruling is unnecessary either because the matter will not affect sentencing or because I will not consider that particular matter in determining the sentence to be imposed. I will then ascertain what the precise guideline

3

application is.  Finally, I will determine and impose a sentence in accordance with the requirements of 18 U.S.C. § 3553.  With respect to the sentences of each of the four defendants convicted in this case, I incorporate by this reference the foregoing into my findings.  To that extent, what is said of one applies to all.

Justin Hernandez has been convicted by the unanimous verdicts of twelve jurors of two crimes: (1) Conspiracy To Commit Assault Resulting In Serious Bodily Injury; and (2) Murder In The Second Degree and Aiding and Abetting.  Mr. Hernandez moves for a below-Guideline sentence.  His motion is well-taken, and for the reasons below I will not mechanically apply the Guidelines in imposing his sentence.  Accordingly, his Motion is GRANTED IN PART to the extent I decline to sentence him under the Guidelines framework and will instead sentence him after considering carefully the factors established in 18  U.S.C. §3553(a).   However, because the sentence I impose is within the Guideline range, his motion is also DENIED IN PART to the extent he requests a sentence below that range.

*Applicable Guidelines Range.*

Pursuant to the Supreme Court's directive, I begin by correctly calculating the applicable sentencing range under the U.S. Sentencing Guidelines.  *See Rita v. United States*, 551 U.S. 338, 347-48 (2007).

The base offense level for Conspiracy to Commit Assault, the offense charged in Count 1,  is 14.  U.S.S.G. §2A2.2, §2X1.1.  Mr. Hernandez objects to enhancements based on the involvement of more than minimal planning (a 2-point enhancement

4

pursuant to U.S.S.G. §2A2.2(b)(1)) and the physical restraint of Mr. Zuniga-Garcia

during the assault (a 2-point enhancement pursuant to U.S.S.G. §3A1.3).  He does not

object to enhancements for use of a dangerous weapon (a 4-point enhancement pursuant

to U.S.S.G. §2A2.2(b)(2)(B))  and for Mr. Zuniga-Garcia's sustainment of permanent or

life-threatening injuries (a 7-point enhancement pursuant to §2A2.(b)(3)(C)).

As provided in the Guidelines, Mr. Hernandez is liable for "all reasonably

foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal

activity" for which he was charged and found guilty.  U.S.S.G. § 1B1.3(a)(1).  At trial,

co-conspirator Rafael Alvarado testified that he held the victim against the back wall of

the cell while the other assailants repeatedly struck the victim with weapons.  By any

definition, this constitutes forcible restraint.  Mr. Alvarado's testimony, corroborated by

the testimony of fellow co-conspirator Javier Vazquez-Duran, satisfies the

"preponderance of the evidence" standard of proof required by the Guidelines.

Furthermore, the physical restraint of Mr. Zuniga-Garcia was a reasonably foreseeable

outcome of the criminal enterprise.  Thus, the enhancement for use of physical restraint is

properly applied and his objection to the 2-point enhancement for forcible restraint is

without merit.

Mr. Hernandez's objection to the application of a 2-point enhancement for the

involvement of more than minimal planning in preparation for the offense is also

unavailing.  As established by a preponderance of the evidence at trial, this was a

deliberately planned attack involving eight co-conspirators.  The co-conspirators

5

discussed their plan, distributed weapons, and timed their attack to occur at a time when they were least likely to be discovered.  These actions evince "more planning than is typical for the commission of the offense in a simple form," and the enhancement applies. Accordingly, as calculated by the Probation Department, the offense level for this offense is 28.[3]

As Mr. Hernandez acknowledges, the base offense level for murder in the second degree, the offense charged in Count 2, is 38.  He does, however, object to the application of a 2-point victim-related adjustment for the physical restraint of Mr. Zuniga-Garcia during the assault, arguing that evidence of restraint was not proven with any reasonable certainty.  This argument is without merit.

As discussed above in connection with Count 1, the preponderance of evidence adduced at trial established that Mr. Zuniga-Garcia  was physically restrained in the commission of the assault which resulted in his murder, and this was a reasonably foreseeable act undertaken in furtherance of the conspiracy.  As a member of the conspiracy, Mr. Hernandez is liable for the reasonably foreseeable actions of his co-conspirators.  The 2-point enhancement for the physical restraint of Mr. Zuniga-Garcia during the commission of the offense is properly applied.  Accordingly, I find that the offense level has been accurately computed by the Probation Department to be 40.

---

[3]  Although totaling the base offense level and the enhancements results in an offense level of 29, the Guidelines limit the total enhancement for use of a dangerous weapon and infliction of life threatening injuries to 10 points.

Pursuant to the Guidelines, the counts with which Defendant Hernandez is charged are grouped together, and the applicable offense level is equal to that of the highest offense level in the group, in this case 40 for Count 2.  *See* U.S.S.G. §3D1.2, §3D1.3. Furthermore, Mr. Hernandez does not object that his criminal history category is VI.

Based on a total offense level of 40 and a criminal history category of VI, the Guidelines recommend a term of incarceration of 60 months as to Count 1 and a term ranging from 360 months to life as to Count 2, both terms to run concurrently with each other and consecutively with the sentence imposed in Case No. 00-cr-3039-RGK-01.  The Guidelines recommend a fine range of $25,000 to $250,000 and a supervised release range of 2 to 3 years as to Count 1 and 3 to 5 years as to Count 2.  Having determined the proper Guidelines calculations, I now turn to the specific circumstances relevant to the sentencing of this defendant.

### *Sentencing under 18 U.S.C. § 3553(a).*

My responsibility is to impose sentences in accordance with 18 U.S.C. § 3553 (a). This statute directs that I consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant, and (2) the need for the sentence imposed. Each sentence must be sufficient, but not greater than necessary, to accomplish four express purposes:

> (A) to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and,
> (D) to provide the defendant with needed educational or vocational training,

medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Applying these standards, I find and conclude as follows:

1. <u>The Nature, Circumstances and Seriousness Of The Offense.</u>

There is no more serious offense than murder.  Before discussing the circumstances of these particular crimes, however, some brief background information is necessary.  Mr. Hernandez and the three defendants convicted with him are members of or affiliated with the Sureños, a group of street gangs with origins in Southern California comprised mostly of Mexican Americans.  The name "Sureño" is the masculine Spanish word for Southerner and a member of the gang is referred to as a "Sureño Soldado" or Southern Soldier.   The influence of the Sureños has spread to many parts of the United States and permeates the state and federal prison populations.  The Sureños declare allegiance to an umbrella organization known as the Mexican Mafia or "La Eme," or "M."  Sureño gang members often identify themselves, frequently with tattoos, using the number 13 to represent the 13th letter of the alphabet, "M".  Other symbols include "Sur," Roman numeral "XIII," "X3," "13," and an arrangement of three dots.  I note that Pablo "Marbles" Zuniga-Garcia had a tattoo on his upper torso of the three dots and the phrase "4 Flats," which is the name of a Sureños-related street gang in Southern California.  The significance of "4 Flats" will become apparent.

The gang has a structured organization and uses code or slang words to identify both the gang and the roles played in it by its members.  Many, if not all, of the members

are given Spanish nicknames, translated into English, such as "Marbles," "Dog," "Owl,"
"Sandwich," "Cousin," and "Evil."

In a prison setting, and in the Florence Correctional Institution in particular, a gang
unit or group is called a "car." The leader of the group is referred to by various terms
including the "shot-caller" and "key-holder" or its Spanish equivalent "Llevero," which
indicates that he has the "keys" to the "car." That is, the car is controlled by him. A
leader of the Mexican Mafia to whom homage is paid by the car and the shot-caller is
referred to respectfully as "Tio," the Spanish word for uncle. In the Bravo units A and B
at the Florence Correctional Institution at the time of the murder of Mr. Zuniga-Garcia,
the shot-caller or Llevero was Justin Hernandez.

Pablo "Canicas" Zuniga-Garcia presented problems for Mr. Hernandez. It is not
clear whether the problems were based on personal animosity or were entirely gang
related, but Zuniga-Garcia challenged Justin Hernandez's authority to direct Zuniga-
Garcia within the Bravo car. As a result, Hernandez formed a conspiracy eventually
involving eight conspirators to "beat down" Zuniga-Garcia. A "beat down" is a beating
severe enough to require prison officials to remove Zuniga-Garcia from the Bravo unit.

On the day of the crime, three of the co-conspirators either facilitated the
movement of gang members from Pueblo B to Zuniga-Garcia's cell or served as lookouts
and four entered Zuniga-Garcia's cell and beat him to death. Another inmate and gang
member, Joaquin Zarco, was also recruited by Hernandez, but he refused to join the
conspiracy unless Hernandez personally participated in the assault. Hernandez declined

9

and thereafter recruited another inmate, Jose Pluma, to take Zarco's place.  Although

conspirator Juan Martin Ruelas agreed to serve as a lookout, he refused to engage

physically in the beating.

Of the eight conspirators, three were charged in separate cases assigned to other

judges.  Each agreed to testify against the remaining five and each reached a plea bargain

to plead guilty to a lesser charge of Assault with a Dangerous Weapon.  Of the remaining

five conspirators, three, along with Hernandez, were tried and convicted.  The eighth

conspirator, Daniel Morones, faces a separate trial on the conspiracy and murder counts

against him this September.

The beating and consequent death of Zuniga-Garcia from multiple head wounds

occurred  in the victim's cell in the early morning hours on December 29, 2008.  The

inmates who administered the beating did so with weapons made by fastening padlocks to

web belting. Although Hernandez continues to deny responsibility for the conspiracy and

the murder of Zuniga-Garcia, he has confirmed these events by his own hand.  In January

2009, less than a month after the murder, he wrote the following letter to another federal

prisoner:

Dearest Uncle,

Greetings and respect to you and those with you.  I hope this letter is
finding you in the best of health and spirits.  So how was your holiday
season?  Did you receive the Christmas card with the seven pictures that I
sent?  I had also had 250 w u sent.  did you receive that also?  Well, a lot
has been going on.  I had a dream the other night which reminded me of you
and I figured I'd better sit down and write to you.  I wanted to share my
dream with you.  I was at your house in the front yard playing with Marbles

4 flatts.  This guy I thought he was a loved one and he just started turning into a monster.  I could hear him whispering to some of my little cousins saying that he was gonna get me or anyone in his way.  there was like a big storm brewing then I woke up.  I had a bad headache but its gone now.  The reason it reminded me of you because I was in your front yard at your house.  Remember when you used to let me mow the grass and take care of the front yard.  I remember there was those couple cousins of mine that used to be jealous that you let me do it and not them.  I guess they thought they could do a better job or something always hating about one thing or the other.  I used to ignore them as much as I could but . . it just reminds me how messed up life is sometimes.  Oh yea, My cousin got into a bad car accident he didn't make it.  We used to tell him not to drive so reckless on those icey highways.  He just would never listen.  He would always say that he would drive anyway he wanted and that he would run over who ever got in his way.  Who knows if he was just joking but it was a bad car wreck and he didn't make it.  I guess one or two of his dogs were sad to see him go.  But a lot of us used to tell him to quit driving so reckless, be carefull on those dangerous roads.  So we had a holiday meal and got together.  I had left K.O. Avenues, gee, culver city at the dinner table.  also Sharky, soxlos and louie fxtroop.  I went to the back yard to see the little cousins playing back there.  So anyways the holidays have come and gone and it's a new year.  It doesn't look like I'm gonna finish high school or go back after christmas vacation but I will get my GED.  I've been studying hard and I will be going to a college real soon hopefully. Hey Uncle, you know your old car that you used to let me drive I don't think I'll be driving for a while.  My cousin K O Avenues is a good driver.  he's got a good head on his shoulders.  he will take care of the Mechanics and he knows to keep up on the payments.  Jeff knows his # if you want to get ahold of him.  Well I hope to hear back from you for your always welcomed insight, advice and opinions.  I am always here for you if you ever need me.  I hope that you will allow me to stay in touch and keep in contact if I ever need your valued advice.  Well with that I will close up by sending my love, honor and respect to you.  Always, your nephew.

It does not require a Rosetta stone to understand the meaning of this letter.

2.  <u>The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect For The Law, Provide Just Punishment, Afford Adequate Deterrence, to Protect the Public, and Provide Defendant with any Effective Treatment</u>.

Justin Hernandez is 39 years old.  He is presently serving a 360 month federal sentence imposed by the United States District Court for the District of Nebraska on November 30, 2001.  Because he was in custody serving this sentence at the time of the commission of the present offenses, the sentences imposed here will be served consecutive to the completion of the undischarged Nebraska sentence.

3.     History and Character of the Defendant Including Correctional Treatment Needs.

Mr. Hernandez has an extensive criminal record including five felony convictions for Attempted Theft, Attempted Second Degree Burglary, Escape, Criminal Impersonation and Possession with intent to distribute methamphetamine.  He was convicted of his first felony at age 18 and was sentenced to probation, but it was revoked and he was sentenced to a lengthy prison term.  His criminal conduct has continued unabated.  While in custody of the Colorado Department of Corrections, he escaped. From about 1998 to 2001, he was on absconder status and committed two more felonies. This record alone indicates he is likely to commit more offenses.  When Mr. Hernandez's record is coupled with his disregard of court orders and supervision requirements and the present convictions, he presents a danger to the public that warrants further and prolonged incarceration.

The information available does not suggest that this defendant is in need of mental health treatment or medical care.  No current or prolonged illnesses are noted.  The Bureau of Prisons has training and educational programs that, consistent with the requirements of prison security and this defendant's institutional conduct, are available to

him.

Although I have already addressed Mr. Hernandez's motion for a variance, it is necessary to address the arguments he raised in support of that motion. First, he asserts that no evidence establishes that he had any idea the beating he ordered of Pablo Zuniga-Garcia would be so brutal and deadly. He argues that the use of padlocks to beat other prisoners is common and no other deaths have been reported as a result of such use. His motion states: "The fact that Mr. Zuniga-Garcia did tragically die from this incident was not a truly foreseeable consequence, given the history of the use of these locks." This is a specious argument and an exercise in sophistry. The commission of a beating with weapons, produced by a conspiracy and resulting in death from multiple head wounds, constitutes the very essence of second degree murder; whoever puts in motion illegal acts resulting in death is guilty of murder. Had the consequence of death been intended rather than unintended, the crime would have been murder in the first degree rather than second degree murder as charged.

Next, the Motion seeks a variance because the Bureau of Prisons did not have a corrections officer present in the unit when the murder occurred and the one officer who entered the building did not hear noises of a beating or take any action. The response to this argument is quite simple: The Bureau of Prisons is not on trial and there is no law excusing anyone from the consequences of his own conduct. Whether this murder could have been prevented by having more prison staff available does not exonerate or mitigate the criminal acts of the members of this conspiracy. Indeed, it is absurd to suggest that

13

those committing a crime are not responsible for their own conduct.  Although I wonder about the absence of judgment in permitting prison inmates access to padlocks and webbed belts, that question is not relevant to this case nor is it within the compass of my jurisdiction.

Another asserted basis for requesting a variance is that others involved in the murder received more favorable treatment from the prosecution because they were cooperating defendants.  Those defendants are not before me.  They have not yet been sentenced and I will not presume to know, nor inquire of other judges, what sentences might be imposed upon them.  As with any sentence, including this one, there are numerous factors which must be taken into consideration.  In the final analysis, a sentence must be determined in the context of the totality of circumstances presented.

Finally, the Defendant asks for a variance based on a letter sent to me by one of the alternate jurors.  I have read that letter more than once and regret that this alternate juror is discomforted by her experience in this case.  I am sure it was grueling and regret that she did not have the opportunity to deliberate and listen to the views of the jurors who rendered their verdicts.  Nevertheless, I am bound by the unanimous verdicts of guilty on all counts as to each defendant, including Justin Hernandez, and it is not appropriate for me to comment further.

*The Sentence Imposed.*

The baseline sentences for these offenses – 60 months (five years) for Count 1, Conspiracy to Commit Assault Resulting in Serious Bodily Injury, and 360 months (30

years) to life imprisonment for Count 2, Murder in the Second Degree and Aiding and

Abetting – are not unreasonable.  Because the sorry events of this case would not have

occurred absent Mr. Hernandez's instigation and leadership, however, a minimum

sentence is not sufficient.  Justice requires that Justin Hernandez should bear the heaviest

penalties.  Therefore, the sentence to be imposed is the maximum of 60 months on Count

1 and 480 months on Count 2.  Both sentences shall run concurrent to each other and

consecutive to the sentence imposed by the District of Nebraska which this defendant is

now serving.  In light of the length of time Mr. Hernandez will be incarcerated for this

offense, I decline to impose the term or conditions of his supervised release.  Such matters

should be addressed nearer the time of his release from custody.  As required by the

Mandatory Victims Restitution Act, Mr.  Hernandez shall be jointly and severally liable

with each of the other seven co-conspirators for restitution in the amount of $ 19,023.55,

and he is individually liable for the special assessment of $200.  Because Mr. Hernandez

has no assets or income, however, a fine is waived in this case and he shall not be

required to pay interest on his restitution obligation.  I note Mr. Hernandez's objections

regarding the restitution amount, but I find that the amount has been adequately verified

by the Probation Department.

The defendant is advised of his right to appeal the sentence.  If the defendant

desires to appeal, a notice of appeal must be filed with the clerk of court within fourteen

days after the entry of judgment or the right to appeal will be lost.  If the defendant is

unable to afford an attorney for an appeal, the Court will appoint one to represent him.  If

the defendant so requests, the clerk of the court must immediately prepare and file a

notice of appeal on his behalf.

The defendant is remanded to the custody of the United States Marshal.

II.

JOSE PLUMA

Defendant Jose Pluma also moves for a departure from the Sentencing Guidelines.

For the reasons previously stated with regard to Mr. Hernandez, I will not mechanically

apply the Guidelines in imposing his sentence, GRANTING in part his Motion to the

extent I decline to follow the Guideline framework and impose a sentence instead in

accordance with the factors established in 18 U.S.C. §3553(a).  Nevertheless, because the

sentence I will impose is within the Guideline range, Mr. Pluma's Motion is DENIED in

part to the extent he requests a sentence below any "recommended" Guideline range.

*Calculation of Applicable Guidelines Range.*

The base offense level for conspiracy to commit assault, the offense charged in

Count 1, is 14. U.S.S.G. §2A2.2, §2X1.1.  After applying  enhancements based on the

involvement of more than minimal planning (a 2-point enhancement pursuant to U.S.S.G.

§2A2.2(b)(1)), use of a dangerous weapon (a 4-point enhancement pursuant to U.S.S.G.

§2A2.2(b)(2)(B)), Mr. Zuniga-Garcia's sustainment of permanent or life-threatening

injuries (a 7-point enhancement pursuant to §2A2.(b)(3)(C)), and the physical restraint of

Mr. Zuniga-Garcia during the assault (a 2-point enhancement pursuant to U.S.S.G.

16

§3A1.3), the total offense level is 28.[4]  Mr. Pluma does not object to these calculations, and I find them proper.

The base offense level for murder in the second degree, the offense charged in Count 2, is 38.  After applying an enhancement for the physical restraint of Mr. Zuniga-Garcia during the murder (a 2-point enhancement pursuant to U.S.S.G. §3A1.3), the total offense level is 40.  Mr. Pluma does not object to this calculation, and I find it proper.

The base offense level for possession of contraband in prison, the offense charged in Count 3, is 13, and no enhancements apply.  Mr. Pluma does not object to this calculation, and I find it proper.

Under the Sentencing Guidelines, the counts with which Defendant Pluma is charged are grouped together, and the applicable offense level is equal to that of the highest offense level in the group, in this case 40 for Count 2.  *See* U.S.S.G. §3D1.2, §3D1.3.  Furthermore, Mr. Pluma does not object that his criminal history category is VI.

Based on a total offense level of 40 and a criminal history category of VI, the Guidelines recommend a term of incarceration of 60 months as to Counts 1 and 3 and a term ranging from 360 months to life as to Count 2, all terms to run concurrently with each other.  The Guidelines recommend a fine range of $25,000 to $250,000 and a supervised release range of 2 to 3 years as to Counts 1 and 3 and 3 to 5 years as to Count

---

[4]  Although totaling the base offense level and the enhancements results in an offense level of 29, the Guidelines limit the total enhancement for use of a dangerous weapon and infliction of life threatening injuries to 10 points.

17

2.  Having determined the proper Guidelines calculations, I now turn to the specific

circumstances relevant to the sentencing of this defendant.

*Sentencing under 18 U.S.C. § 3553(a)*

Applying the criteria set out in 18 U.S.C. § 3553(a), I find as follows:

1.   <u>The Nature, Circumstances and Seriousness of the Offense.</u>

There is no crime more ancient nor serious than murder.  Much has been said in

this case that the murder of Pablo Zuniga-Garcia was not intended, but rather that the

intent was to beat him severely enough that he would have to be removed from the

housing unit to which he was assigned and placed elsewhere.  The death of Mr. Zuniga-

Garcia, resulting from a fifteen-minute beating at the hands of a minimum of four men

armed with dangerous weapons who left him helpless and unattended on the floor of his

cell, is recognized in virtually every legal system as murder.

It has been argued that Pablo Zuniga-Garcia's death was not intended.  Indeed, if

such had been the case and the object of this conspiracy had been to kill him, the

appropriate charge would have been murder in the first degree rather than murder in the

second degree.  Nevertheless, it is indisputably murder and this defendant is and will be

forever more a murderer.  Inaccuracy in assessing the consequences of a heinous and

brutal act does not alter its character; it only makes the actions of the perpetrators even

more lamentable.

2.   <u>Sentence Sufficient to Promote Respect For The Law, Provide Just Punishment,
Afford Adequate Deterrence to Criminal Conduct, and Protect the Public from
Further Crimes of the Defendant.</u>

This defendant, Jose Pluma, was first convicted of a felony at the age of 17.  Since then he has been convicted of a string of violent crimes including menacing, criminal mischief, reckless endangerment, possession of drugs, aggravated motor vehicle theft, possession of a dangerous weapon, aggravated assault, riot, introduction of contraband into a correctional institution and weapons violations.  Throughout this lifetime of criminal activity, Mr. Pluma is the one person involved in altercations who consistently possessed the weapons, fired the guns, and physically attacked his victims.  At the time that he committed this murder, he was already in prison.

In view of the brutality of the murder of Pablo Zuniga-Garcia and his unremitting record of violence, to say this defendant presents a continuing danger from which the public needs protection is an understatement. His life-long record of criminality and violence argues persuasively that his commission of further crimes is in practical terms a near certainty.  The term recidivism is not appropriate because it means a relapse into a previous condition.  In Mr. Pluma's case there is no previous condition, but rather a continuation of one violent act after another.  I find that a lengthy sentence of incarceration is necessary both to provide some degree of justice to Mr. Zuniga-Garcia and his family and to protect society from Mr. Pluma's further depradations.

I note that in the sentencing statement filed on Mr. Pluma's behalf by his counsel there is reference to a possible plea bargain offered on the eve of trial that Mr. Pluma was willing to accept.  This statement is vehemently denied by the government.  Until receiving the sentencing statement I knew nothing of any plea bargain proposals.  Mr.

Pluma asserts the government offered a package deal in which the charged defendants would plead guilty to the assault count and the murder charge would be dropped, but the offer was conditioned upon all of the defendants accepting it.  Mr. Pluma suggests he should receive consideration for his willingness to accept responsibility.  There is no point is pursuing this contention further, because even if all defendants had agreed, I would not have accepted such a plea bargain, nor do I think such a conditioned proposal should be dignified by calling it an acceptance of responsibility.

3.    History and Character of the Defendant Including Correctional Treatment Needs.

This defendant has killed while in custody.  There is no reason to assume that if given the opportunity and motivation he will not kill again.  The only treatment available for him — that which I determine to be sufficient, but not excessive— is prolonged incarceration.  The presentence report states that Mr. Pluma has never been treated by a mental health professional. Mr. Pluma says that he does not have any mental health treatment needs.  I agree and find no basis for thinking otherwise.  Indeed, if there is any treatment for his dangerously aggressive antisocial behavior, it is confinement in a closed and restricted environment until such time that age and Mr. Pluma's consequent debility reduce his demonstrated ability to commit violent acts.

This defendant's character is reflected in the commission of the offense.  Mr. Pluma participated directly in the beating of Pablo Zuniga-Garcia for fifteen minutes, at least three of which while the victim was on the floor of his cell and unable to offer any resistance.  He persisted in beating the victim even though the victim told him to stop, it

was enough, and even after his co-defendant Mr. Ruelas told him to stop.  Mr. Pluma has

refused to accept responsibility for his actions and has failed entirely to express remorse

for Pablo Zuniga-Garcia's death or for the suffering visited upon his family.

*Sentence Imposed.*

The baseline sentences for these offenses – 60 months (five years) for Count 1,

Conspiracy to Commit Assault Resulting in Serious Bodily Injury, and 360 months (30

years) to life imprisonment for Count 2, Murder in the Second Degree and Aiding and

Abetting – are not unreasonable.  Because of Mr. Pluma's history of violent crime and his

direct participation in the actual assault which led to Mr. Zuniga-Garcia's death, however,

a minimum sentence is not sufficient.  Justice requires that Jose Pluma should bear a

heavy penalty.  Therefore, the sentence to be imposed is the maximum of 60 months on

Counts 1 and 3 and 420 months on Count 2, all sentences to be served concurrently.  In

light of the length of time Mr. Pluma will be incarcerated for this offense, I decline to

impose the term or conditions of his supervised release.  Such matters should be

addressed nearer the time of his release from custody.  As required by the Mandatory

Victims Restitution Act, Mr. Pluma shall be jointly and severally liable with each of the

other 7 co-conspirators for restitution in the amount of $ 19,023.55, and he is individually

liable for the special assessment of $300.  Because Mr. Pluma has no assets or income,

however, a fine is waived in this case and he shall not be required to pay interest on his

restitution obligation.

The defendant is advised of his right to appeal the sentence.  If the defendant

desires to appeal, a notice of appeal must be filed with the clerk of court within fourteen days after the entry of judgment or the right to appeal will be lost.  If the defendant is unable to afford an attorney for an appeal, the Court will appoint one to represent him.  If the defendant so requests, the clerk of the court must immediately prepare and file a notice of appeal on his behalf.

The defendant is remanded to the custody of the United States Marshal.

III.

JUAN MARTIN RUELAS

Neither the government nor the defendant has filed any objections to the presentence report or to the Sentencing Guideline calculations contained in it. Nevertheless, pursuant to the Supreme Court's directive in *Rita*, I begin by correctly calculating the applicable sentencing range under the U.S. Sentencing Guidelines.

*Applicable Guidelines Range.*

The base offense level for conspiracy to commit assault, the offense charged in Count 1, is 14.  U.S.S.G. §2A2.2, §2X1.1.  After applying  enhancements based on the involvement of more than minimal planning (a 2-point enhancement pursuant to U.S.S.G. §2A2.2(b)(1)), use of a dangerous weapon (a 4-point enhancement pursuant to U.S.S.G. §2A2.2(b)(2)(B), Mr. Zuniga-Garcia's sustainment of permanent or life-threatening injuries (a 7-point enhancement pursuant to §2A2.(b)(3)(C)), and the physical restraint of Mr. Zuniga-Garcia during the assault (a 2-point enhancement pursuant to U.S.S.G.

§3A1.3), the total offense level is 28.[5]  Mr. Ruelas does not object to these calculations, and I find them proper.

The base offense level for murder in the second degree, the offense charged in Count 2, is 38.  After applying an enhancement for the physical restraint of Mr. Zuniga-Garcia during the murder (a 2-point enhancement pursuant to U.S.S.G. §3A1.3), the total offense level is 40.  Mr. Ruelas does not object to this calculation, and I find it proper.

Under the Sentencing Guidelines, the counts with which Defendant Ruelas is charged are grouped together, and the applicable offense level is equal to that of the highest offense level in the group, in this case 40 for Count 2.  *See* U.S.S.G. §3D1.2, §3D1.3.  Furthermore, Mr. Ruelas does not object that his criminal history category is VI.


Based on a total offense level of 40 and a criminal history category of VI, the Guidelines recommend a term of incarceration of 60 months as to Count 1 and a term ranging from 360 months to life as to Count 2, both terms to run concurrently with each other.  The Guidelines recommend a fine range of $25,000 to $250,000 and a supervised release range of 2 to 3 years as to Count 1 and 3 to 5 years as to Count 2.

The defendant has moved for a non-guideline variant sentence.  I grant the motion, but not for the reasons stated in the motion.  Rather, I depart from the Guideline range

---

[5]  Although totaling the base offense level and the enhancements results in an offense level of 29, the Guidelines limit the total enhancement for use of a dangerous weapon and infliction of life threatening injuries to 10 points.

because the recommendation is advisory and I can find no basis upon which to evaluate the advice thus given.  I accept the 60 months and 360 months Guideline provisions as a baseline, but no reasons are given to support the calculations and there is no manifestation in the provisions of any effort to make those provisions on the basis of the individual circumstances of this defendant or the context in which he participated in the crimes for which he was convicted.

*Sentencing under 18 U.S.C. § 3553(a).*

Having determined the proper Guidelines calculations, I now turn to the specific circumstances relevant to the sentencing of this defendant.   Applying the criteria set out in § 3553, I find as follows:

1.   <u>The Nature, Circumstances and Seriousness Of The Offense.</u>

At the instigation of another defendant, Justin Hernandez, Pable Zuniga-Garcia was ordered to be beaten.  The beating resulted in his death and is unquestionably the crime of second degree murder.  This defendant stood outside the victim's cell and acted as a lookout during the beating and afterward assisted in covering up the event by concealing some of the bloody clothing of the assailants.  This defendant had been asked by Justin Hernandez to be one of the assailants and he had refused, however, agreeing only to serve as a lookout.  Moreover, as the beating was taking place, this defendant attempted to intervene and told the assailants to stop the beating.  His refusal to be an assailant, his attempt to stop the beating and his courage to speak out are factors which mitigate his participation in these crimes.  Aggravating his participation, however, is the

fact that knowing the victim was helpless and bleeding on his cell floor, he did nothing to provide him aid.  Although the assault was extremely violent, this defendant, Juan Martin Ruelas, did not personally engage in violent acts.

2.      Sentence Sufficient to Promote Respect For The Law, Provide Just Punishment, Afford Adequate Deterrence to Criminal Conduct, and Protect the Public from Further Crimes of the Defendant.

This defendant has sustained convictions for burglary, disorderly conduct, possession of controlled substance, possession of cocaine base for sale, grand theft auto, possession of a controlled substance within 1000 feet of a school, possession of drug paraphernalia, and re-entry into the United States of a previously removed alien.  At the time of the murder of Pablo Zuniga-Garcia, the defendant was incarcerated on two federal cases arising in the District of Utah, one for a supervised release violation.

3.      History And Characteristics Of The Defendant Including Correctional Treatment Needs.

The defendant is 39 years old and recently completed two custodial sentences.  He is unable to recall any substantive information about his early childhood development beyond being raised in Mexico and moving to the United States.  He is in need of medical treatment for Hepatitis C (probably caused by habitual drug use), diabetes mellitus, and high blood pressure.  He is depressed and in need of a mental evaluation and treatment.

Given this defendant's mental and physical health problems, his effort to decline participation in the crimes, his efforts to stop the beating of Zuniga-Garcia and that his criminal record is comparatively free of violence, I find his sentence should be less than

that of his co-defendants.  Nevertheless, his involvement in a murder cannot be excused

or justified and therefore substantial punishment is warranted.  Based on the foregoing, I

determine that a sentence of 60 months on Count 1 and 240 months on Count 2, said

sentences to run concurrently, is sufficient, but not greater than necessary, to accomplish

the purposes of the congressional mandate expressed in 18 U.S.C. § 3553(a).  In light of

the length of time Mr. Ruelas will be incarcerated for this offense, I decline to impose the

term or conditions of his supervised release.  Such matters should be addressed nearer the

time of his release from custody.  As required by the Mandatory Victims Restitution Act,

Mr. Ruelas shall be jointly and severally liable with each of the other 7 co-conspirators

for restitution in the amount of $ 19,023.55, and he is individually liable for the special

assessment of $200.  Because Mr. Ruelas has no assets or income, however, a fine is

waived in this case and he shall not be required to pay interest on his restitution

obligation.

The defendant is advised of his right to appeal the sentence.  If the defendant

desires to appeal, a notice of appeal must be filed with the clerk of court within fourteen

days after the entry of judgment or the right to appeal will be lost.  If the defendant is

unable to afford an attorney for an appeal, the Court will appoint one to represent him.  If

the defendant so requests, the clerk of the court must immediately prepare and file a

notice of appeal on his behalf.

The defendant is remanded to the custody of the United States Marshal.

III.

26

MARK ROSALEZ

*Applicable Guidelines Sentencing Range.*

The base offense level for conspiracy to commit assault, the offense charged in Count 1, is 14.  U.S.S.G. §2A2.2, §2X1.1.  Mr. Rosalez objects to enhancements based on the involvement of more than minimal planning (a 2-point enhancement pursuant to U.S.S.G. §2A2.2(b)(1)), use of a dangerous weapon (a 4-point enhancement pursuant to U.S.S.G. §2A2.2(b)(2)(B), Mr. Zuniga-Garcia's sustainment of permanent or life-threatening injuries (a 7-point enhancement pursuant to §2A2.(b)(3)(C)), and the physical restraint of Mr. Zuniga-Garcia during the assault (a 2-point enhancement pursuant to U.S.S.G. §3A1.3).

His principal objection is that he should not be held for acts which he did not physically commit or participate in.  Pursuant to the Guidelines, however, Mr. Rosalez is liable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" for which he was charged and found guilty. U.S.S.G. § 1B1.3(a)(1).  At trial, the preponderance of the evidence established that the defendants forcibly restrained Mr. Zuniga-Garcia and used a dangerous weapon to inflict life-threatening injuries on him.  Furthermore, each of these acts was a reasonably foreseeable outcome of the criminal enterprise.  Thus, the enhancements for use of a dangerous weapon, infliction of life-threatening injury, and forcible restraint are properly applied.

Mr. Rosalez's objection to the application of a 2-point enhancement for the

involvement of more than minimal planning in preparation for the offense is also without

merit.  As established by a preponderance of the evidence at trial, this was a deliberately

planned attack involving eight co-conspirators.  The co-conspirators discussed their plan,

distributed weapons, and timed their attack to occur at a time when they were least likely

to be discovered.  These actions evince "more planning than is typical for the commission

of the offense in a simple form," and the enhancement applies.  Accordingly, as

calculated by the Probation Department, the offense level for this offense is 28.[6]

As Mr. Rosalez acknowledges, the base offense level for murder in the second

degree, the offense charged in Count 2, is 38.  He does, however, object to the application

of a 2-point victim-related adjustment for the physical restraint of Mr. Zuniga-Garcia

during the assault, arguing that evidence of restraint was not proven with any reasonable

certainty.  In the alternative, he argues that the adjustment should not apply because he

did not physically participate in any restraint.  Both arguments are without merit.

Co-conspirator Rafael Alvarado testified that he held the victim against the back

wall of the cell while the other assailants repeatedly struck the victim with weapons.  By

any definition, this constitutes forcible restraint.  Mr. Alvarado's testimony, corroborated

by the testimony of fellow co-conspirator Javier Vazquez-Duran, satisfies the

"preponderance of the evidence" standard of proof required by the Guidelines.

---

[6] Although totaling the base offense level and the enhancements results in an offense
level of 29, the Guidelines limit the total enhancement for use of a dangerous weapon and
infliction of life threatening injuries to 10 points.

Mr. Rosalez's argument that he should not be held liable for acts which he did not physically commit is similarly unavailing. Pursuant to the Guidelines, Mr. Rosalez is liable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" for which he was charged and found guilty. U.S.S.G. § 1B1.3(a)(1). The restraint of Mr. Zuniga-Garcia was a reasonably foreseeable act, within the scope of the conspiracy, and the adjustment applies to Mr. Rosalez.

Mr. Rosalez also argues that he should be allowed a 2-point reduction, because he was a "minor participant" in the offense. *See* U.S.S.G. § 3B1.2(b). In order to be eligible for this reduction, Mr. Rosalez must show that he is "substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comment n.3(A) and n.5. Having weighed the totality of the circumstances, I find he has failed to establish that he is a minor participant; this reduction does not apply. Accordingly, I find that the offense level has been accurately computed by the Probation Department to be 40.

Under the Sentencing Guidelines, the counts with which Defendant Rosalez is charged are grouped together, and the applicable offense level is equal to that of the highest offense level in the group, in this case 40 for Count 2. *See* U.S.S.G. §3D1.2, §3D1.3. Furthermore, Mr. Rosalez does not object that his criminal history category is III.

Based on a total offense level of 40 and a criminal history category of III, the Guidelines recommend a term of incarceration of 60 months as to Count 1 and a term ranging from 360 months to life as to Count 2, both terms to run concurrently with each

29

other and consecutively with the sentence imposed in Case No. 05-cr-00133-WFD-04.

The Guidelines recommend a fine range of $25,000 to $250,000 and a supervised release

range of 2 to 3 years as to Count 1 and 3 to 5 years as to Count 2.  Having determined the

proper Guidelines calculations, I now turn to the specific circumstances relevant to the

sentencing of this defendant.

*Sentencing under 18 U.S.C. § 3553(a).*

Applying the criteria set out in 18 U.S.C. § 3553(a), I find as follows:

1.    The Nature, Circumstances and Seriousness of the Offense.

This defendant actively assisted Justin Hernandez in the organization of the

conspiracy to assault Pablo Zuniga-Garcia.  He recruited other co-conspirators to

participate in the assault.  He had full knowledge of when the attack was to occur and left

the cell he shared with the deceased shortly before the attack began.  Despite knowing

that the victim was severely beaten, he did nothing to render him assistance, or seek aid or

medical attention.  Based on his illegal acts and those of the co-conspirators, the victim

died.

2.    Sentence Sufficient to Promote Respect For The Law, Provide Just Punishment,
      Afford Adequate Deterrence to Criminal Conduct, and Protect the Public from
      Further Crimes of the Defendant.

With the exception of the felony conviction for drug trafficking, the sentence for

which he is now imprisoned, this defendant's criminal history is minimal.  His

involvement in drug trafficking, however, is a serious crime not to be minimized.  His

role in this offense alone establishes that Mark Rosalez is a danger to the public.

30

3. <u>History and Character of the Defendant Including Correctional Treatment Needs.</u>

Mr. Rosalez is 43 years old.  Until age 8 he was raised in Mexico and was then taken to California.  He has a tenth grade education and a self-reported history of substance abuse.  Before his incarceration he was not a member of the Sureños. Mr. Rosalez has never suffered from mental illness or emotional disorder.  He has four ruptured discs in his spine and suffers from chronic pain.  His pain has contributed to his drug abuse.  Mr. Rosalez can read and write English, he can speak Spanish and he can benefit from further education.  His physical condition suggests that he is not a suitable candidate for job training involving manual labor.  He can benefit from training and education programs offered by the Bureau of Prisons.

*Sentence Imposed.*

Given Mr. Rosalez's physical condition and age, and his relatively sparse, but serious, criminal record, I find the rule of lenity should be applied.  Because Mr. Rosalez has a lengthy sentence to complete before beginning to serve the instant ones, a sentence of less than the baseline of 360 months will be sufficient to protect the public and to provide just punishment and deterrence.  I do not, however, find that his sentence should be as low as that of his co-defendant Ruelas who at least put forth some effort to stop the fatal beating of Mr. Zuniga-Garcia.  Therefore, considering all of the above, I find an appropriate sentence for Count 1 is 60 months and for Count 2 is 300 months, these sentences to be served concurrent with each other and consecutive to the sentence pronounced by the Wyoming District Court and now being served.  In light of the length

31

of time Mr. Rosalez will be incarcerated for this offense, I decline to impose the term or conditions of his supervised release.  Such matters should be addressed nearer the time of his release from custody.  As required by the Mandatory Victims Restitution Act, Mr. Rosalez shall be jointly and severally liable with each of the other 7 co-conspirators for restitution in the amount of $ 19,023.55, and he is individually liable for the special assessment of $200.  Because Mr. Rosalez has no assets or income, however, a fine is waived in this case and he shall not be required to pay interest on his restitution obligation.

The defendant is advised of his right to appeal the sentence.  If the defendant desires to appeal, a notice of appeal must be filed with the clerk of court within fourteen days after the entry of judgment or the right to appeal will be lost.  If the defendant is unable to afford an attorney for an appeal, the Court will appoint one to represent him.  If the defendant so requests, the clerk of the court must immediately prepare and file a notice of appeal on his behalf.

The defendant is remanded to the custody of the United States Marshal.


Dated *nunc pro tunc* to August 25, 2011.

**s/John L. Kane**
SENIOR U.S. DISTRICT JUDGE